Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: lking@kaplanfox.com
mchoi@kaplanfox.com

*Attorneys for Plaintiff GIANT EAGLE, INC.*

[*Additional Counsel Appear on Signature Page*]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GIANT EAGLE, INC.<br><br>Plaintiff,<br><br>v.<br><br>TRI-UNION SEAFOODS, LLC, d/b/a CHICKEN OF THE SEA INTERNATIONAL; KING OSCAR, INC.; BUMBLE BEE FOODS, LLC, f/k/a BUMBLE BEE SEAFOODS, LLC; and STARKIST CO.,<br><br>Defendants. | CASE NO. 3:15-cv-4886<br><br>**COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Giant Eagle, Inc. ("Giant Eagle"), by and through undersigned counsel, complains as follows

## NATURE OF THE CASE

1. This action arises from a conspiracy to raise, fix, stabilize, or maintain prices, allocate customers, and restrict capacity in the market for shelf-stable packaged seafood, including tuna, clam, crab, mackerel, oyster, salmon, sardines, and shrimp ("Packaged Seafood") sold in the United States, from at least as early as January 1, 2000, through the present (the "Relevant Period"), by Defendants Tri-Union Seafoods, LLC, d/b/a Chicken of the Sea, King Oscar, Inc., Bumble Bee Foods, LLC f/k/a Bumble Bee Seafoods, LLC, and StarKist Co. (collectively, "Defendants").

2. Giant Eagle bring this action to (i) recover treble damages, attorneys' fees, litigation expenses, and court costs, and (ii) secure injunctive relief for violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

3. As alleged more fully below, by early 2000, growth in the Packaged Seafood industry had slowed, and the prospects for growth were dim. Beginning at least as early as January 2000, in an effort to combat the prospect of diminishing profits, Defendants and their co-conspirators conspired to raise, fix, stabilize, or maintain prices, allocate customers, and restrict capacity in the market for Packaged Seafood sold in the United States. As a direct and proximate result of Defendants' cartel activities, Giant Eagle was overcharged by Defendants for Packaged Seafood.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

5. Defendants and their co-conspirators engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended

anticompetitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

6. Venue is proper in this district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Giant Eagle's claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more Defendants reside, are found, have agents, are licensed to do business, are doing business, or transact business in this district.

7. This Court has in personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Packaged Seafood throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.

## PARTIES

### A. Plaintiff

8. Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business located at 101 Kappa Drive, Pittsburgh, PA 15238. During the Relevant Period, Giant Eagle purchased Packaged Seafood directly from one or more Defendants, and has been injured in its business or property by reason of the antitrust violations alleged in this complaint.

### B. Defendants

9. Defendant Tri-Union Seafoods, LLC, d/b/a Chicken of the Sea International ("COTS") is a Delaware limited liability company with its principal place of business at 4510 Executive Drive, # 3, San Diego, CA 92121.

10. Defendant King Oscar, Inc. ("KOI") is a Delaware corporation with its principal place of business at 3838 Camino Del Rio North, Suite 115, San Diego, CA 92108.

11. Defendants COTS and KOI (together, "Tri-Union") are wholly-owned subsidiaries of Thai Union Frozen Products Public Company, Ltd. ("Thai Union"), a publicly held company headquartered in Thailand.

12. Defendant Bumble Bee Foods, LLC, f/k/a Bumble Bee Seafoods, LLC ("Bumble Bee") is a Delaware limited liability company with its principal place of business at 9655 Granite Ridge Drive, Suite 100, San Diego, CA 92123. Bumble Bee is a wholly-owned subsidiary of Lion Capital, a private investment firm headquartered in Great Britain.

13. Defendant StarKist Co. ("StarKist") is a Delaware corporation with its principal place of business at 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212. StarKist is a wholly-owned subsidiary of Dongwon Enterprises Co., which is headquartered in Korea.

14. Defendants and their co-conspirators directly and through their affiliates sold Packaged Seafood in the United States and in this district at artificially inflated prices during the Relevant Period. Defendants are direct competitors in the United States Packaged Seafood market.

## AGENTS AND CO-CONSPIRATORS

15. Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this complaint.

16. Various other persons, firms, companies, and corporations not named as Defendants have knowingly and willingly conspired with Defendants, and performed acts and made statements in furtherance of the conspiracy and in furtherance of the anticompetitive conduct.

17. The acts alleged to have been done by any Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## INTERSTATE TRADE AND COMMERCE

18. Defendants Tri-Union, Bumble Bee, and StarKist are the leading manufacturers of Packaged Seafood sold in the United States.

19. The referenced Packaged Seafood products are produced by Defendants or their affiliates in either the United States or overseas.

20. During the Relevant Period, Tri-Union, Bumble Bee, and StarKist, directly or through one or more of their affiliates, sold Packaged Seafood throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

21. The activities of Defendants and their co-conspirators were within the flow of, and intended to, and did, have a substantial effect on interstate commerce in the United States.

22. Defendants' and their co-conspirators' conduct, including the marketing and sale of Packaged Seafood, took place within, and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States and upon import commerce with foreign nations.

23. The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived Giant Eagle of the benefits of free and open competition in the purchase of Packaged Seafood within the United States.

24. Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of Packaged Seafood, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Packaged Seafood prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on United States commerce and on import trade and commerce with the United States.

## FACTUAL ALLEGATIONS

### A. Background

25. Packaged Seafood is composed of raw seafood that is processed to preserve and enhance flavor, and ensure product safety. Because it is typically caught far offshore, raw seafood is usually delivered to canneries frozen or refrigerated.

26. Upon delivery to a processing plant, an initial quality control inspection is performed to ensure the seafood was stored and transported at the proper temperature and is in

acceptable condition. The seafood is maintained at temperatures ranging from 0° to -18° Celsius until processing. Seafood passing the initial quality control inspection is prepared for packaging.

27. Accepted seafood is initially transferred to large ovens for “pre-cooking.” After further cleaning, the seafood is fed into filling machines where product packages (either cans, pouches, or cups) are filled with pre-set amounts. Filled packages are moved to sealing machines where they are closed and sealed.

28. Each package is affixed with a permanent production code identifying plant, product, date packed, batch, and other information. Filled and sealed packages are then cooked under pressure to make the products commercially sterile and give them a long shelf life.

29. All three Defendants sell Packaged Seafood in the United States. StarKist, Bumble Bee and Tri-Union all sell packaged tuna, clams, salmon, and sardines. Bumble Bee and Tri-Union also sell packaged crabs, mackerel, oysters, and shrimp.

30. The United States Packaged Seafood industry generates annual sales of approximately $2.6 billion. Tuna is the largest category within Packaged Seafood, generating estimated annual sales of approximately $1.7 billion.

31. Defendants dominated the United States market for Packaged Seafood throughout the Relevant Period. In 2001, Defendants had a combined market share of 85%, which is approximately the same percentage they have today: StarKist 36-40%; Bumble Bee 25%; and Tri-Union 20%.

32. After decades of growth, demand for Packaged Seafood has been declining since 2000. From about 1950 until 2000, packaged tuna was the most popular seafood in the United States. In 1990, the International Trade Commission estimated that Americans consumed between one-half and two-thirds of the global supply of packaged tuna.

33. Since the 1990s, health and sustainability concerns, which range from fears of mercury poisoning to fury over dolphin bycatch, have taken their toll. So, too, has a national shift away from packaged seafood.

34. As a result, domestic consumption of Packaged Seafood has experienced a steady decline since 2000 (*see* Figure 1 below). Yet, the prices of Packaged Seafood increased steadily from 2000 to 2015.

***<u>Figure 1</u>***




35. In particular, packaged tuna saw a steady decline in U.S. per capita consumption from 3.5 to 2.4 pounds per person per annum between 2000 and 2014 (*see* Figure 2 below).

***<u>Figure 2</u>***



36. However, since 2005, the price of packaged tuna has skyrocketed (*see* Figure 3 below).

***Figure 3***




37. In a competitive environment, a decline in demand for a product will normally lead to a decline in the price of that product. However, because Defendants controlled the market and agreed with each other to restrict capacity, allocate customers, and fix the prices of Packaged Seafood, the prices of Packaged Seafood were intentionally and collaboratively set at artificially high levels throughout the Relevant Period.

38. These price increases since the beginning of 2000 were a direct result of Defendants' conspiracy to restrict capacity, allocate customers, and fix the prices of Packaged Seafood in the United States. As a result, Giant Eagle paid artificially inflated prices for Packaged Seafood purchased from the Defendants.

**B. <u>Defendants' Anticompetitive Conspiracy</u>**

39. Beginning at least as early as January 2000 and continuing to the present, Defendants Tri-Union, Bumble Bee, and StarKist participated together in anticompetitive communications, including telephone calls (sometimes multiple times a day) and frequent face-to-face meetings at pre-arranged locations, including hotels and restaurants. During these

meetings and telephone calls, Defendants shared sensitive business information, and entered into agreements to fix, raise, stabilize, and maintain prices of Packaged Seafood sold to customers in the United States.

40. Senior executives of the three companies met at least twice a year.

41. At other times, top executives regularly discussed prices and shared sensitive customer information.

42. Throughout the Relevant Period, Defendants communicated regularly by telephone to discuss prices and sensitive customer information. For example, during at least one telephone conversation between Bumble Bee and Starkist executives, Starkist informed Bumble Bee that StarKist and Tri-Union were in agreement to raise prices.

43. As part of the conspiracy, Defendants discussed pricing, and agreed to coordinate the timing and amount of price increases for Packaged Seafood sold to customers in the United States. Defendants also agreed to restrict capacity and allocate customers.

44. Defendants agreed to exchange, and did exchange, information during their telephone conversations and meetings for the purpose of monitoring and enforcing adherence to their agreements.

45. Defendants had ample opportunities for collusion. Defendants routinely attended trade shows and conferences during which they discussed Packaged Seafood pricing and other aspects of their conspiracy. Defendants also collaborated on many projects during the Relevant Period, including their joint “Tuna the Wonderfish” advertising campaign and the International Seafood Sustainability Foundation.

46. The “Tuna the Wonderfish” advertising campaign, which ran from early 2011 through early 2012, was designed to stem the tide of declining sales of Packaged Seafood in the United States. The “Tuna the Wonderfish” campaign gave Defendants ample opportunity to conspire to raise and fix Packaged Seafood prices. Although the campaign was unsuccessful in boosting consumption, Defendants nonetheless jointly implemented a price increase in 2012 in the face of falling demand.

47. Defendants Bumble Bee and Tri-Union also co-operate on seafood processing and packaging. Bumble Bee co-packs for the West Coast for Tri-Union in Bumble Bee's Santa Fe Springs, California plant, while Tri-Union returns the favor for the East Coast at its Lyons, Georgia plant.

**THE CHARACTERISTICS OF THE UNITED STATES**
**PACKAGED SEAFOOD MARKET ARE CONDUCIVE TO COLLUSION**

48. The structure and characteristics of the Packaged Seafood market in the United States are conducive to a price-fixing agreement.

49. Packaged Seafood is a commodity product that is sold directly to retail chains and through grocery wholesalers and distributors, such as Giant Eagle. Packaged Seafood varieties have similar shelf life, contain similar amounts of seafood, and are marketed in cans, pouches, and cups. Therefore, purchasers of Packaged Seafood are more likely to be influenced by price when making a purchasing decision.

50. There are substantial barriers that preclude, or reduce, entry into the Packaged Seafood market, including high start-up costs, manufacturing expertise, access to raw materials, and access to distribution channels. Therefore, Defendants could collectively raise prices without fear of being undercut by new entrants.

51. Purchasers routinely source their Packaged Seafood from one of the three Defendants. As a result, Defendants dominate the United States Packaged Seafood market.

52. Defendants possessed significant market power to raise prices for Packaged Seafood above competitive levels in the United States.

53. There are no economically reasonable substitutes for Packaged Seafood. Alternative seafood, such as frozen seafood or fresh seafood, do not have commensurate shelf lives and require preparation, such as cooking, before they can be consumed.

**THE DOJ INVESTIGATION**

54. The San Francisco office of the antitrust division of the United States Department of Justice ("DOJ") is conducting an investigation into anticompetitive practices in the United States Packaged Seafood industry. The DOJ has convened a grand jury. Two of the three largest

United States Packaged Seafood manufacturers, Tri-Union and Bumble Bee, have publicly confirmed receipt of grand jury subpoenas.

55. On July 23, 2015, Thai Union confirmed that its subsidiary "Tri-Union Seafoods LLC, operating in the United States under the brand Chicken of the Sea ha[d] received a subpoena requiring the production of relevant information to the DOJ," and that "Chicken of the Sea is cooperating fully with the investigation."

56. As an indication of the seriousness of the DOJ's investigation, Thai Union also announced that it had suspended a planned public offering, which it had announced just a week earlier on July 17, 2015. The company stated that it wanted additional clarity on this investigation before proceeding with the public offering, and that Thai Union had notified the Securities and Exchange Commission of the suspension.

57. On July 23, 2015, Bumble Bee acknowledged receipt of a grand jury subpoena, stating, "The Company did receive a grand jury subpoena relating to a US Department of Justice investigation into potential antitrust violations in the packaged seafood industry. The Company is cooperating fully with the investigation."

58. StarKist has not announced whether it received a grand jury subpoena.

59. Upon information and belief, one of the Defendants applied for admittance into the DOJ's corporate leniency program to report Defendants' price-fixing activity and other anticompetitive conduct violative of the Sherman Act § 1 in the United States Packaged Seafood market.

60. Upon information and belief, one of the Defendants has been accepted into the DOJ corporate leniency program.

## GIANT EAGLE SUFFERED ANTITRUST INJURY

61. Defendants' conspiracy had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to Packaged Seafood; and

b. The prices of Packaged Seafood have been fixed, raised, maintained, or stabilized at artificially inflated levels.

62. During the Relevant Period, Defendants charged supra-competitive prices for Packaged Seafood sold to Giant Eagle. By reason of Defendants' alleged violations of the antitrust laws, Giant Eagle has sustained injury to their businesses or property, having paid higher prices for Packaged Seafood than they would have paid absent Defendants' alleged illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount to be determined. This is an antitrust injury of the type the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

63. Throughout the Relevant Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from discovery by Giant Eagle.

64. Giant Eagle did not discover, and could not have discovered through the exercise of reasonable diligence, which they, in fact, exercised, the existence of the conspiracy and Defendants' and their co-conspirators' involvement in the conspiracy until July 23, 2015, when the DOJ's investigations first became public.

65. Because the conspiracy was actively concealed until July 23, 2015, Giant Eagle was unaware of Defendants' and their co-conspirators' unlawful conduct, and did not know that they were paying artificially high prices for Packaged Seafood.

66. The affirmative acts of Defendants and their co-conspirators, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

67. Defendants and their co-conspirators agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

68. Defendants and their co-conspirators met and communicated secretly concerning the pricing and marketing of Packaged Seafood as to avoid detection.

69. Giant Eagle could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques

employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy, or combination. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers, and surreptitious communications among Defendants and their co-conspirators via telephone or in in-person meetings in order to prevent the existence of written records.

70. Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until July 23, 2015, Giant Eagle had no knowledge of the alleged conspiracy or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

71. None of the facts or information available to Giant Eagle prior to July 23, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy prior to July 23, 2015.

72. As a result of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to Giant Eagle's claims of anticompetitive conduct alleged in this Complaint.

## COUNT I

## VIOLATION OF THE SHERMAN ACT § 1

73. Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

74. Defendants' anticompetitive acts were intentionally directed at the United States Packaged Seafood market, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Packaged Seafood prices throughout the United States.

75. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

a. Prices charged to, and paid by, Giant Eagle for Packaged Seafood were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b. Giant Eagle has been deprived of the benefits of free, open, and unrestricted competition in the United States Packaged Seafood market; and

c. Competition in establishing the prices paid for Packaged Seafood has been unlawfully restrained, suppressed, or eliminated.

76. Defendants' and their co-conspirators' anticompetitive activities have directly and proximately caused injury to Giant Eagle in the United States.

77. As a direct and proximate result of Defendants' unlawful conduct, Giant Eagle paid artificially inflated prices for Packaged Seafood.

78. As a direct and proximate result of Defendants' unlawful conduct, Giant Eagle has been damaged in its business or property by paying prices for Packaged Seafood that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Giant Eagle prays that the Court:

A. Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constitutes a per se violation of Section 1 of the Sherman Act;

B. Adjudge and decree that each Defendant, and its successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition in the United States Packaged Seafood market;

C. Enter judgment against Defendants, jointly and severally, in favor of Giant Eagle for treble damages determined to have been sustained by Giant Eagle by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

D. Award Giant Eagle its attorneys' fees, litigation expenses, and court costs, as well as pre-judgment and post-judgment interest as permitted by United States law; and

E. Grant Giant Eagle such other and further relief as the case may require, or as the Court deems just and proper under the circumstances.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Giant Eagle demands a trial by jury.

Dated: October 23, 2015

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/ *Laurence D. King*
Laurence D. King
Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: lking@kaplanfox.com
mchoi@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
mmccahill@kaplanfox.com

**MARCUS & SHAPIRA LLP**
Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
Erin Gibson Allen
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758
Email: marcus@marcus-shapira.com
cain-mannix@marcus-shapira.com
hill@marcus-shapira.com
allen@marcus-shapira.com

*Counsel for Plaintiff, Giant Eagle, Inc.*

**SPROUSE SHRADER SMITH, PLLC**
Johnny K. Merritt
701 S. Taylor Street, Suite 500
Amarillo, TX 79101
Telephone: (806) 349-4713
Facsimile: (806) 373-3454
Email: johnny.merritt@sprouselaw.com

**THE COFFMAN LAW FIRM**
Richard L. Coffman
First City Building
505 Orleans St., Fifth Floor
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

*Of Counsel for Plaintiff, Giant Eagle, Inc.*